IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CINDY DALTON,                          §
                                       §
                    Plaintiff,         §
                                       §  Civil Action No. 3:19-CV-2484-D
VS.                                    §
                                       §
C. R. BARD, INC., et al.,              §
                                       §
                    Defendants.        §

MEMORANDUM OPINION
AND ORDER

This is a products liability action filed directly by plaintiff Cindy Dalton ("Dalton")

in the Southern District of West Virginia as part of the multidistrict litigation ("MDL")

entitled *In re: C. R. Bard, Inc., Pelvic Repair System Products Liability Litigation*, MDL No.

2187. It is one of a group of cases not resolved in the MDL transferee court ("MDL court"),

and it was transferred to this court at the conclusion of coordinated pretrial proceedings.

Defendant C. R. Bard, Inc. ("Bard") now moves, in pertinent part, to exclude the specific

causation opinions and testimony of Dalton's expert witness, William Edward Porter, M.D.

("Dr. Porter"). And on the assumption that Dr. Porter's specific causation opinions are

excluded, and on other grounds, Bard moves for summary judgment on all of Dalton's

claims. For the reasons that follow, the court denies Bard's motion to exclude Dr. Porter's

specific causation opinions and testimony, and it grants in part and denies in part Bard's

motion for summary judgment.[1]

I

Bard manufactured a device called "Bard's Align Suprapubic Urethral Support System" ("Align device" or "sling").[2]  Dalton, a Texas resident, was implanted in 2010 with the Align device at a hospital in Texas.  After experiencing alleged vaginal pain and mesh exposure, Dalton filed suit directly in MDL No. 2187.  Dalton used the short form complaint, which employs a "check the box" method for identifying the plaintiff's claims and incorporates the master complaint as to each box checked.  Using this method, Dalton alleges the following causes of action: count I (negligence); count II (strict liability—design defect); count III (strict liability—manufacturing defect); count IV (strict liability—failure to warn); count V (breach of express warranty); count VI (breach of implied warranty); and count VIII (punitive damages).  According to the master complaint, count I (negligence) encompasses failure "to use reasonable care in designing, manufacturing, marketing, labeling, packaging and selling the [p]roducts," as well as failure to use reasonable care in testing and inspecting the products, and failure to warn.  Master Compl. 18, 21.

---

[1]These motions were originally set to be orally argued on March 26, 2020.  Due, however, to the impact of the coronavirus disease (COVID-19) and pursuant to Special Order 13-5, signed by the Chief Judge on March 13, 2020, the hearing was canceled.  These motions are being decided on the papers, without oral argument.

[2]In deciding Bard's motion for summary judgment, the court views the evidence in the light most favorable to Dalton as the summary judgment nonmovant and draws all reasonable inferences in her favor.  *See, e.g., Owens v. Mercedes-Benz USA, LLC*, 541 F.Supp.2d 869, 870 n.1 (N.D. Tex. 2008) (Fitzwater, C.J.) (citing *U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.)).

Before the lawsuit was transferred to this court, Bard filed the instant motion for summary judgment and a motion to exclude the opinions and testimony of Dr. Porter, Dalton's specific causation expert. Dalton has since abandoned her claims for manufacturing defect, breach of warranty, and negligent inspection, marketing, packaging and selling. The court will therefore address Bard's motion for summary judgment as it pertains to Dalton's remaining claims for negligent design, strict liability—design defect, failure to warn, and punitive damages, and Bard's motion to exclude Dr. Porter's causation opinions and testimony.

The parties agree, and the court concurs, that the substantive law of Texas governs this case.[3]

## II

The court turns first to Bard's motion to exclude the expert opinions and testimony of Dr. Porter on the ground that they are based on a flawed differential diagnosis.

---

[3]In multidistrict litigation, "the [c]ourt is bound to apply the [substantive] law of the transferor forum." *Hildebrandt v. Indianapolis Life Ins. Co.*, 2009 WL 804123, at *2 (N.D. Tex. Mar. 26, 2009) (Boyle, J.). In a directly-filed case that is later transferred, however, it is not immediately apparent which court is the "transferor forum," because the MDL court is not literally the transferee court: it did not receive the case by transfer. But under Fifth Circuit authority, "[c]ases that are *directly filed* in an MDL court are treated 'as if they were transferred from a judicial district sitting in the state where the case originated.'" *In re Depuy Orthopaedics, Inc.*, 870 F.3d 345, 348 (5th Cir. 2017) (emphasis added) (citing *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*, 2011 WL 1375011, at *6 (S.D. Ill. Apr. 12, 2011)); *see also Wahl v. Gen. Elec. Co.*, 786 F.3d 491, 497 (6th Cir. 2015) (discussing choice of law and holding that it is the law of the "court of proper venue," not that of the MDL court, that should apply in a directly filed case). Because this case originated in Texas—the surgery and all related factual issues arose in Texas—and the parties agree that Texas substantive law governs, the court concurs in this conclusion.

A

"The court decides these motions in its role as gatekeeper under Fed. R. Evid. 702."
*SEC v. Cuban*, 2013 WL 3809654, at *1 (N.D. Tex. July 23, 2013) (Fitzwater, C.J.) (citation
omitted) (citing *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002)). "The court
may admit proffered expert testimony only if the proponent, who bears the burden of proof,
demonstrates that (1) the expert is qualified, (2) the evidence is relevant to the suit, and (3)
the evidence is reliable." *Nunn v. State Farm Mut. Auto. Ins. Co.*, 2010 WL 2540754, at *2
(N.D. Tex. June 22, 2010) (Fitzwater, C.J.) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S.
137, 147 (1999)).

Because Bard challenges as unreliable the methodology underlying Dr. Porter's
specific causation opinions, the court will focus primarily on the third prong of the *Daubert*
inquiry. "Reliability is determined by assessing 'whether the reasoning or methodology
underlying the testimony is scientifically valid.'" *Knight v. Kirby Inland Marine Inc.*, 482
F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 592-93); *see also* Rule 702(c)
(requiring that "testimony [be] the product of reliable principles and methods"). Expert
testimony "must constitute 'more than subjective belief or unsupported speculation.'" *Nunn*,
2010 WL 2540754, at *2 (quoting *Daubert*, 509 U.S. at 590). The court focuses on the
expert's methodology, not the conclusions generated by it. *Id.* at *4 (citing *Watkins v.
Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997)). If, however, "there is simply too great an
analytical gap between the [basis for the expert opinion] and the opinion proffered," the court
may exclude the testimony as unreliable. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997);

*see also Johnson v. Arkema, Inc.*, 685 F.3d 452, 460-61 (5th Cir. 2012); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 278-79 (5th Cir. 1998).  This review is usually conducted by considering the five nonexclusive *Daubert* factors.[4]  But these factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of [the] testimony."  *Kumho*, 526 U.S. at 150.

The burden is on the proponent of the expert testimony to establish its admissibility by a preponderance of the evidence.  *See Daubert*, 509 U.S. at 592 n.10; *see also Johnson*, 685 F.3d at 459.  The court's inquiry is flexible in that "[t]he relevance and reliability of expert testimony turns upon its nature and the purpose for which its proponent offers it."  *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010) (citation omitted).  "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [trier of fact's] consideration."  *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596; *Nunn*, 2010 WL 2540754, at *5.

---

[4]The five nonexclusive *Daubert* factors are: (1) whether the expert's technique can be or has been tested; (2) whether the method has been subjected to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Daubert*, 509 U.S. at 593-94.

In his expert report, Dr. Porter states that, based on his differential diagnosis, it is "[his] opinion to a reasonable degree of medical probability that the cause of Ms. Dalton's mesh exposure and initial vaginal pain are directly related to her Align [device]." P. Resp. in Opposition to Mot. to Exclude ("P. Resp. Exclude Mot.") Ex. A at 6.[5] He opines that because the vagina is a "contaminated area, there is no way to completely eliminate bacteria from the surgical site," and for this reason, "[i]mplantation [of the Align device] through this dirty field could allow bacteria to . . . attach to the mesh and secrete a biofilm or . . . slime[.]" *Id.* at 5. Relying on medical literature, he states that this slime prevents "the host defensive mechanism from clearing the infection," and the "tissue response can contribute to the cause of vaginal pain, pelvic pain[,] and chronic inflammation" and cause mesh "erosion [or exposure], vaginal discharge[,] and possible [Urinary Tract Infections ("UTIs")]." *Id.*[6] And, as stated in the general causation expert report, "the mesh creates a foreign body reaction," which "can cause a severe and chronic inflammatory reaction leading to excessive scarring in and around the mesh." *Id.* The mesh degrades over time and causes a "chronic foreign body reaction, fibrotic bridging, mesh contracture/shrinkage, fraying, particle loss, roping

---

[5]Because the parties' briefs and supporting papers were filed in the Southern District of West Virginia before the case was transferred to this court, they do not comply with this court's local civil rules, including the requirement that documents of this type be included in an appendix. The court therefore cites the summary judgment record according to how it was developed in the Southern District of West Virginia.

[6]Dr. Porter testified at his deposition that he would have replaced "exposure" with the word "erosion." P. Resp. Exclude Mot. Ex. B. at 94:22-25.

and curling of the mesh," which contributes to the pain. *Id.*

Dr. Porter opines that the Align device "directly caused [Dalton's] mesh exposure" and vaginal pain as evidenced by the "vaginal mesh exposure" and "tenderness [found] along her [the Align device]" as well as the fact that "[h]er treating physicians also agreed with this assessment and . . . chose to remove the mesh." *Id.* He further opines that the "subsequent removal compromise[d] her urethra[l] tissue which increased [the] chance of her urethral vaginal fistula." *Id.* 6. Dr. Porter states that her "dyspareunia is also due to scarring around the urethra from her sling." *Id.*

Citing medical literature, Dr. Porter opines that "complications of mesh increase with time" and can lead to "excessive fibrillary matrix deposition (fibrosis and encapsulation)." *Id.* Moreover, he states that mesh removed for pain is "consistent with tissue deposition and encapsulation," and that mesh removed for erosion or exposure can indicate "proinflammatory and tissue destruction." *Id.* He points to medical literature that demonstrates that the degenerative process elicited by polypropylene creates "an ongoing host inflammation," and he notes that "[v]irtually all meshes removed from women due to complications have evidence of deformation and pore collapse." *Id.* This "mesh exposure," he opines, "may represent a medical phenomenon in which altered mesh geometries result in increased stiffness which leads to a degenerative response as a result of stress shielding and ongoing destructive inflammation." *Id.*

According to Dr. Porter's report, after he reviewed Dalton's records and medical literature, he "consider[ed] other potential causes, including post-op scarring from her pelvic

floor surgery," her "previous pelvic surgery, vaginal atrophy[,] and repeat pubovaginal sling." *Id.* He "concluded that they could be ruled out as a source of her initial vaginal pain and dyspareunia[.]" *Id.* Dr. Porter also opines that Dalton "did have some tenderness to her bladder prior to her surgery," and although "this could not be ruled out as contributing to her pain," it "could be rule[d] out for her vaginal mesh exposure." *Id.*

Dr. Porter then states that, based on his analysis of Dalton's record, medical literature, and his education, training, and knowledge, it is his opinion to a reasonable degree of medical probability and scientific certainty that Dalton's treating physicians met the standard of care when implanting the Align device, and that he "found no evidence of surgical error or deviation from the requisite procedural steps." *Id.* And after reviewing the operative reports, he saw "no evidence of any surgical complications," and he believes that Dalton was an "appropriate candidate for the procedures at the time of her implants." *Id.*

Dr. Porter ultimately concludes that "it is [his] opinion that to a reasonable degree of medical probability that the cause of Ms. Dalton's mesh exposure and initial vaginal pain are directly related to her Align [device]." *Id.* He opines that her mesh exposure and vaginal pain are what the medical literature describes "as chronic inflammation around the mesh which leads to thinning and mesh exposure." *Id.* He also concludes that "her sling removal put her urethra at risk for development of her urethral vaginal fistula" and that her "dyspareunia is also due to scarring around the urethra from her sling." *Id.*

C

Bard contends that Dr. Porter's specific causation opinions are unreliable because they are derived from a flawed differential diagnosis. According to Bard, although Dr. Porter stated in his report that he considered other causes of Dalton's pain, he "did not take serious account of the other potential causes of [Dalton's] alleged symptoms," and he failed to exclude these causes with reasonable certainty. D. Mem. in Support of Mot. to Exclude ("D. Exclude Mem.") at 8. Bard posits that Dr. Porter "conceded that [Dalton] had many of the same symptoms prior to her 2010 . . . implant of the [Align device]," including "tenderness in her bladder prior to her 2010 surgery," "preexisting complaints of dyspareunia prior to 2010," and "preexisting vaginal atrophy," all of which Dr. Porter admitted either "could" or "probably is contributing to her pain currently still." *Id.* at 9. Dr. Porter also "acknowledged the fact that [Dalton] could have had the exact same outcome with regard to her symptoms had she undergone the same procedure with a different mesh device." *Id.* at 10. Thus, in Bard's view, Dr. Porter's opinion that the Align device caused her complaints of pain, dyspareunia, and recurrent incontinence "is merely speculation . . . based on an unreliable differential diagnosis." *Id.* at 8. Bard asserts that "Dr. Porter is unable to offer an opinion to a reasonable degree of medical certainty . . . that the symptoms [Dalton] experienced were caused by the specific design of the [Align device]," and not the other preexisting conditions, and contends that his opinions and testimony should be excluded for this reason. *Id.* at 10.

Dalton responds that several courts, including the MDL court, have rejected attacks on Dr. Porter's qualifications and the reliability of his opinions in litigation against Bard.

She posits that "Dr. Porter's testimony is not meaningfully different than the testimony that was at issue in those prior cases," and that "the challenges to Dr. Porter's testimony offered here should fail for the same reasons." P. Resp. Exclude Mot. at 2. Dalton also contends that Dr. Porter's differential diagnosis is reliable because he states in his report that he considered other potential causes, including "post-operative scarring from pelvic floor surgery, previous pelvic surgery, vaginal atrophy, and the repeated implantation of pubovaginal slings." *Id.* at 6. Dalton maintains that because Dr. Porter "affirmatively stated in his report that each 'could be ruled out' as a cause of those complaints," and "recited statistics concerning the rate of dyspareunia in women with mesh implants and offer[ed] the explanation of other experts to frame the general causal link between mesh products and those complications," Dr. Porter's differential diagnosis is sufficiently reliable. *Id.* at 7. She posits that "the fact that her injuries were symptomatic before the implant does not categorically preclude the possibility that [she] experienced similar post-implantation symptoms . . . directly related to the [Align] device or even that the mesh exacerbated her symptoms." *Id.* at 9.

To the extent more support is required, Dalton maintains that Dr. Porter's deposition testimony demonstrates that his differential diagnosis adequately ruled out other potential causes of Dalton's injuries. For example, when asked about a 2012 notation in Dalton's medical records that suggests that the exposure or erosion was not the mesh, but instead an ETHIBOND suture, Dr. Porter testified that "the Align [device] (and not the suture) was in the identified location." *Id.* at 9. And "while records from 2012 pointed to the suture, by 2014 another physician examined Ms. Dalton and noted that she was suffering from

significant problems," including dyspareunia and possible mesh erosion. *Id.* In other words, although there "are records to suggest that a suture was the likely foreign body found in 2012, a [later] physical examination identified likely erosion and linked it to Ms. Dalton's symptoms, including her dyspareunia." *Id.* at 10. And in 2014, records recognized "pain along the sling itself." *Id.* Moreover, when Dalton underwent a revision surgery in 2014 and had some of the Align device mesh removed, "[t]he notes from that procedure postoperatively diagnosed Ms. Dalton's preoperative pelvic pain to have arisen from 'TVT mesh erosion into the urethra'" and in a follow-up after the revision, Dalton reported that her pelvic pain had resolved. *Id.*

As to alternative causes, when asked about vaginal atrophy as the cause of dyspareunia, Dr. Porter ruled in eroded mesh based on Dalton's report that something was scratching her husband during intercourse. Dr. Porter stated that he ruled out the previous pelvic surgery, vaginal atrophy, and repeat pubovaginal sling as a cause. Likewise, he ruled out fibroids as a cause because they are associated with pain during menstruation, and he ruled out cystocele as unusual. Thus, in Dalton's view, "Dr. Porter was able to exclude the various possibilities as the sole cause of Ms. Dalton's injuries, which allowed him to conclude that the mesh was a specific cause[.]" *Id.* at 11. If Dr. Porter failed to rule out other possible causes, Dalton contends that this "go[es] to the weight of the expert's testimony, and not the admissibility of the opinion," particularly where "the controlling state law recognizes, in product liability actions, that there may be more than one producing cause of an injury." *Id.* at 7, 8.

Bard replies that the admissibility of Dr. Porter's specific causation opinions in other cases is irrelevant to the admissibility of his opinions in this case. Bard reiterates that Dr. Porter's differential diagnosis is unreliable because it fails to adequately consider and rule out preexisting tenderness in Dalton's bladder, vaginal atrophy, and other causes as the producing cause of Dalton's mesh exposure or pain. Bard also contends that the methodology is unreliable because Dr. Porter could not opine with more than 50% certainty that the cause of Dalton's current dyspareunia and pain is due to the Align device.

## D

### 1

A "differential diagnosis" is "a scientific technique that essentially involves the process of elimination." *Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 401 (5th Cir. 2016). Although this methodology may be "reliable under *Daubert* when used by medical experts," the "results of a differential diagnosis are far from reliable *per se*." *Id.* "A reliable differential diagnosis . . . generally is accomplished by determining the possible causes for the patient's symptoms and then eliminating each of those potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely." *Johnson*, 685 F.3d at 468 (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir. 1999)). An "expert's causation opinions will not be excluded because he or she has failed to rule out every possible alternative cause of a plaintiff's illness." *Chrastecky v. C. R. Bard, Inc.*, 2020 WL 748182, at *6 (W.D. Tex. Feb. 14, 2020) (quoting *Priddy v. C. R. Bard, Inc.*, 2018 WL 662500, at *2 (S.D. W. Va. Feb. 1, 2018)). "[O]ther possible

alternative causes affect the weight—not the admissibility—of an expert's testimony, unless the expert can provide *no* explanation for ruling out such alternative causes at trial." *Id.*

The court concludes that Dr. Porter engaged in a sufficiently reliable differential diagnosis to produce an admissible opinion in this case. His export report and deposition demonstrate that he *did* consider many of the alternative causes that Bard raises. Because he in fact considered many of the alternative causes that Bard suggests, his inability to conclusively rule out all other possible causes, including preexisting bladder tenderness and vaginal atrophy, and his failure to assess whether the Align device is the most probable cause of her current pain do not render his methodology and resulting opinion unreliable.

Moreover, Texas law governing causation demonstrates that Dr. Porter need not point to a single cause of Dalton's injury. In the design defect context, the defect must simply be a "producing cause of the injury." *Goodner v. Hyundai Motor Co.*, 650 F.3d 1034, 1040 (5th Cir. 2011) (citing *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex. 2009)). "To be a producing cause, '(1) the cause must be a substantial cause of the event in issue and (2) it must be a but-for cause, namely one without which the event would not have occurred.'" *Emery v. Medtronic, Inc.*, 793 Fed. Appx. 293, 295 (5th Cir. 2019) (per curiam) (quoting *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 46 (Tex. 2007)). Stated differently, "Texas courts define producing cause as one that is a substantial factor in bringing about an injury." *Scott v. Dorel Juvenile Grp., Inc.*, 456 Fed. Appx. 450, 454-55 (5th Cir. 2012) (per curiam) (internal quotation marks omitted). This standard recognizes "that there may be more than one producing cause of an event." *Williams v. Remington Arms Co.*, 2008 WL 222496, at

*2 n.4 (N.D. Tex. Jan. 28, 2008) (Fitzwater, C.J.). Thus because the Align device need only be a "substantial factor" or a "producing cause" to establish liability under the causes of action that Dalton brings, Dr. Porter was not required to negate all possible alternative causes and opine that the Align device is the sole cause to render a reliable and relevant opinion. Accordingly, Bard's contention that Dr. Porter's testimony is unreliable because it fails to adequately address other potential causes goes to the weight of his testimony rather than its admissibility.

2

The court's conclusion is bolstered by the disposition of the case and the rulings related to the MDL from which it arises. Because Dalton directly filed this case in the Southern District of West Virginia, and the instant motions were filed and briefed while the case was still pending in the MDL court, this court deems the MDL court's previous rulings to be particularly persuasive. Dr. Porter's testimony has been repeatedly admitted over nearly identical objections. *See, e.g., Degarmo v. C. R. Bard, Inc.*, 2018 WL 700795, at *2 (S.D. W. Va. Feb. 2, 2018); *Newell v. C. R. Bard, Inc.*, 2018 WL 650212, at *2 (S.D. W. Va. Jan. 31, 2018); *Stevens v. C. R. Bard, Inc.*, 2018 WL 650214, at *2 (S.D. W. Va. Jan. 31, 2018). For example, Bard contended in *Newell* that "Dr. Porter failed to perform a reliable differential diagnosis." *Newell*, 2018 WL 650212, at *2. The MDL court rejected this contention and held that "Dr. Porter's expert report and deposition testimony show that he conducted a detailed review of the plaintiff's medical records" and "considered numerous alternative causes for the plaintiff's injuries and concluded that they could be ruled out as a

cause of the plaintiff's injuries." *Id.* Moreover, during his deposition, Dr. Porter "explained in more detail his reasons for ruling out these various alternative causes." *Id.* For these reasons, the MDL court ultimately held that "Bard's suggested other possible alternative causes affect the weight—not the admissibility of [Dr. Porter's] testimony," and that "[t]o the extent that Bard believe[d] that Dr. Porter failed to consider other alternative causes properly or varied his confidence in his assessments, Bard [would be] free to address those issues on cross-examination." *Id.* This court likewise concludes that Dr. Porter sufficiently considered alternate causes to render his differential diagnosis a reliable methodology, and it therefore denies Bard's motion to exclude Dr. Porter's opinions and testimony.[7]

### III

The court turns next to Bard's motion to exclude Dr. Porter's opinions and testimony as based on insufficient facts or data.

### A

Bard contends that Dr. Porter's opinions and testimony are based on insufficient facts or data because there is little recent evidence of exposure and the risk of exposure is low. Although Dr. Porter "opined to a reasonable degree of medical probability 'that the cause of Ms. Dalton's mesh exposure and initial vaginal pain are directly related to her [Align

---

[7]Dr. Porter's reasons for ruling out each specific alternative cause are not particularly clear either in his expert report or his deposition. This may due to what the rules require be included in an expert report and to the fact that Dr. Porter's deposition was taken by defense counsel, who did not have the incentive to develop Dr. Porter's testimony with the same comprehensiveness as would Dalton's counsel. Nevertheless, for the reasons explained, the court declines to exclude Dr. Porter's testimony on specific causation.

device],'" Bard emphasizes that Dr. Porter "conceded that 'other than . . . one instance of erosion from 2014,' there were not 'any other tangible pieces of evidence that the [Align device] mesh eroded.'"  D. Exclude Mem. at 10.  Bard also reiterates that Dr. Porter acknowledged that there has been "no evidence of mesh erosion or exposure for the [Align device]" from 2015 until now, and that there is only a "3 percent" risk of exposure from the [Align device]."  *Id.* at 10-11.  In light of these alleged admissions, Bard contends that "Dr. Porter did not have a sufficient factual basis for the opinion" that Dalton's "Align device cause[d] her complaints."  *Id.* at 11.

Dalton responds that Dr. Porter's testimony was based on sufficient, reliable data. Although Bard suggests that there was no other tangible evidence of mesh erosion, Dalton points to the "postoperative note in Dr. Morgan's records that identified erosion [or exposure], which led to a revision and a postoperative diagnosis that Ms. Dalton's symptoms had been caused by that erosion."  P. Resp. Exclude Mot. at 13.  Dalton contends that because she brought the claim in November 2012, before the revision, "[t]he fact of erosion-related injuries at even one point in time thereafter suffices . . . to satisfy the injury element of her products liability claim."  *Id.*  She reiterates that "Dr. Porter's testimony causally and specifically links the identified erosion of the Align [device] to injuries sustained by Ms. Dalton, even if it might not be the sole cause of those injuries."  *Id.*  Dalton also reiterates that Dr. Porter's opinions are not rendered unreliable or irrelevant based on his lack of testimony regarding the Align device itself because he relies on general causation expert testimony and applies that testimony to Dalton's specific case.

Bard contends that Dalton's arguments are not relevant to whether Dr. Porter's opinions and testimony are based on sufficient facts because she "conflates her arguments related to whether Dr. Porter's differential diagnosis is reasonable with" those related to the sufficiency of evidence. D. Reply Mot. Exclude 5. Bard also posits that the testimony of the general causation experts is irrelevant to demonstrating that Dr. Porter's opinions are based on sufficient facts because "Dr. Porter cannot opine that a defect in the Bard device was the cause of [Dalton's] claimed injury." *Id.* at 6. Moreover, Bard asserts that there is no evidence that Dr. Porter undertook his own, independent investigation of Dalton's case and he instead "blindly recit[ed] the opinions of other experts as his own." *Id.* at 8. Accordingly, Bard contends that Dr. Porter's reliance on the testimony of general causation experts likewise demonstrates that his opinions are based on insufficient facts or data.

B

The court declines to accept Bard's challenge to Dr. Porter's testimony as based on insufficient facts or data. Dr. Porter's concession that there is no other tangible evidence that the Align device eroded—other than one instance of erosion from 2014—does not eliminate the possibility of erosion between the initial implantation of the Align device in 2010 and 2014. Likewise, the absence of mesh erosion from 2015 until now does not negate evidence of erosion *before* that time. And any uncertainty as to whether Dalton's *current* pain was caused by the Align device or other surgeries does not exclude the possibility of pain caused by the Align device immediately following its 2010 implantation.

As to the risk of exposure, Bard appears to mischaracterize Dr. Porter's testimony.

Defense counsel asked whether Dalton "is likely to experience additional erosion or exposure from the [Align device]," to which Dr. Porter responded that there is a "3 percent" chance of future exposure. P. Resp. Exclude Mot. Ex. B at 25. Because the absence of erosion or exposure years after implantation, uncertainty as to the cause of Dalton's present pain, and the slight risk of future exposure from the Align device do not negate or eliminate the possibility of previous exposure and pain resulting from the initial implantation of the Align device, the court declines to exclude Dr. Porter's testimony as based on insufficient facts or data.

The court also rejects Bard's contentions that Dr. Porter did not conduct his own investigation into Dalton's case and that he is impermissibly relying on the opinions and testimony of general causation experts. As Dr. Porter's expert report makes clear, in reaching his conclusion, he thoroughly reviewed Dalton's medical records and relied on medical literature as well as the testimony of the general causation experts and his own expertise. To the extent any of the evidence, including the opinions of the general causation experts, on which Dr. Porter relies is "shaky," "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are . . . appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

IV

The court turns now to Bard's motion to exclude opinions and testimony either disclaimed by Dr. Porter or not contained within his expert report.

A

Bard contends that Dr. Porter should be precluded from "opining on topics he disclaimed at his deposition" and failed to include in his expert report, including "alternative products that were available in 2010," "the adequacy of the labeling and/or instructions for use for the products," "whether Bard violated FDA regulations," "the design of the Avaulta and Align products," opinions related to Dalton's "life care planning," "the implanting physician, procedure[,] or the implanting physician's knowledge of the risks and benefits of the product," and the "implanting physician's choice of product for [Dalton]." D. Exclude Mem. at 11, 12. Bard contends that because Fed. R. Civ. P. 26 requires a complete statement of opinions to be expressed at trial, Dr. Porter must be precluded from testifying as to any opinions not included in his expert report, and that he is otherwise unqualified to provide opinions regarding the adequacy of labels, instructions for use, biochemical properties of medical devices, and related technical issues.

Dalton responds that "Dr. Porter will not offer general causation opinions in this case and will not opine on the existence of a safer alternative design." P. Resp. Exclude Mot. at 15. Dalton contends, however, that Dr. Porter "is qualified to testify regarding the tendency of mesh to contract, degrade[,] and lose structural integrity after implantation in the human body." *Id.* Dalton does not appear to address the remaining topics Bard seeks to exclude.

B

The court grants Bard's motion to exclude Dr. Porter's testimony as to matters not contained within his expert report. "The text of [Rule] 37 is clear: 'If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence [at a trial].'" *Arizpe v. Principal Life Ins. Co.*, 398 F.Supp.3d 27, 48 (N.D. Tex. 2019) (Fish, J.) (quoting Rule 37(c)(1)) (excluding excerpts of deposition on matters not disclosed in expert's report). Because certain matters were not contained within his expert report, the court precludes Dr. Porter's testimony on the following: alternative products available in 2010, the adequacy of labeling and/or instructions for use for the products, potential violations of FDA regulations, and Dalton's life care planning. And because Dr. Porter conceded that he has no opinion regarding the consent process or the risk and benefits Dalton's implanting physician discussed with her, *see* P. Resp. Exclude Mot. Ex. B at 24, the court excludes this testimony to the extent it remains relevant to any surviving claims. Moreover, because Dalton has specifically acknowledged that Dr. Porter will not testify as to the existence of a safer alternative design, the court also grants Bard's motion as to this issue.

But to the extent Bard seeks to exclude Dr. Porter's opinions regarding the tendency of mesh to degrade by seeking to exclude his opinions on the "design of the Avaulta and Align products," the court declines to exclude such testimony. This is so because this was included in his expert report, he is qualified to testify on the matter, and the degradation supports his specific causation opinion. Dr. Porter specifically opined in his expert report

that "[v]irtually all meshes removed from women due to complications have evidence of deformation and pore collapse," and "mesh exposure may represent mechanical phenomenon in which altered mesh geometries result in increased stiffness which leads to a degenerative response as a result of stress shielding and ongoing destructive inflammation[.]" P. Resp. Exclude Mot. Ex. A at 6. And, as the MDL court has held, "a urogynecologist's extensive experience with performing mesh implant and explant surgeries can qualify him or her to opine on how the product reacts inside the body." *Winebarger v. Boston Sci. Corp.*, 2015 WL 1887222, at *26 (S.D. W. Va. Apr. 24, 2015) (permitting Dr. Porter, as a specific causation expert, to "opine on the degradation of mesh or its tendency to shrink, contract, curl, fold, wrinkle, fragment, or cause pain in general"). Dr. Porter's lack of "experience in polymer science is irrelevant because Dr. Porter is not offering opinions about what[] [is] happening at the molecular level." *Id.* (internal quotation marks omitted). Because his opinions relate to "mesh degradation on a large scale, focusing on the ways a polypropylene mesh product can change after implantation in the human body," and he is qualified given his "undeniable" experience in the area of pelvic medicine, Dr. Porter may opine to the mesh degradation as included within his report "to the extent that they are applicable to his differential diagnosis in this specific case." *Id.* Of course, opinions related to the design of the Align device or other opinions related to general causation that extend beyond mesh degradation after implantation and what is clearly included in Dr. Porter's expert report will be excluded.

V

The court turns next to Bard's motion for summary judgment on all remaining claims.

A

When a party moves for summary judgment on claims on which the opposing party will bear the burden of proof at trial, the moving party can meet its summary judgment obligation by pointing the court to the absence of admissible evidence to support the nonmovant's claims. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party does so, the nonmovant must go beyond her pleadings and designate specific facts showing there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). An issue is genuine if the evidence is such that a reasonable jury could return a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmovant's failure to produce proof as to any essential element of a claim renders all other facts immaterial. *See TruGreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.). Summary judgment is mandatory if the nonmovant fails to meet this burden. *Little*, 37 F.3d at 1076; *Barnard v. L-3 Commc'ns Integrated Sys. L.P.*, 2017 WL 3726764, at *3 (N.D. Tex. Aug. 30, 2017) (Fitzwater, J.)

B

Bard contends that it is entitled to summary judgment on all of Dalton's claims because she "failed to establish a genuine issue of material fact regarding causation," which is "a fundamental element of every claim that Plaintiff has pled in her complaint." D. Mem.

in Support of Mot. Summary Judgment ("D. Summ. J. Mem.") at 4. Bard asserts that, even assuming *arguendo* that Dr. Porter's testimony is admissible, Dalton "failed to offer any testimony from an expert medical professional asserting that, to a reasonable degree of medical certainty, the [Align device] at issue in this case caused [Dalton's] alleged injuries[.]" *Id.* at 5. Bard contends that because Dr. Porter stated that he could not say that the Align device was a greater than 50% cause of her current pain or dyspareunia, Dr. Porter "was unable to attribute [Dalton's] alleged injuries to the [Align device] with a reasonable degree of medical certainty." *Id.* Likewise, Bard maintains that "Dr. Porter was unable to attribute [Dalton's] fistula directly to the [Align device] because 'it wasn't there previous to the Solyx, so [he] [could not] say [the Align device] caused it directly,'" and that Dr. Porter had no record that Dalton suffered an increased number of UTIs as a result of the Align device. *Id.* at 6. For this reason, Bard contends that Dalton "has offered no expert testimony that the [Align device] was a substantial factor or the but-for cause of any of [her] injuries." *Id.*

Dalton responds that Dr. Porter's specific causation opinions raise a genuine dispute of material fact as to causation. She contends that Dr. Porter's "report identifies a causal link between the [Align device] and Ms. Dalton's injuries" and "spell[s] out his opinion that Ms. Dalton's injuries were caused by the Align [device]." P. Resp. in Opposition to Mot. for Summ. J. ("P. Summ. J. Resp.") at 5. Dalton maintains that Dr. Porter's report identifies her prominent injuries as "vaginal pain and mesh exposure" directly linked to "the Align TVT mesh," and that her dyspareunia and pelvic pain "derived specifically from chronic

inflammation from the mesh[.]" *Id.* She further posits that Dr. Porter's acknowledgment that other factors may have contributed to her injuries does not undermine his opinion on causation because Texas law recognizes that a producing cause need not be the only cause of a claimant's injuries.

Bard replies that there is no genuine dispute of material fact as to causation because Dr. Porter "failed to establish a causal link *directly* attributing Plaintiff's alleged injuries to the [Align device]." D. Summ. J. Reply at 4. Bard asserts that Dalton has mischaracterized Dr. Porter's opinions. Bard points to Dr. Porter's deposition in which he states, "I can't say [the Align device is] the sole cause or the only cause" of Dalton's overactive bladder, and he reiterates that he could not quantify the cause of Dalton's current pain as more than 50%. *Id.* (quoting P. Resp. Exclude Mot. Ex. B at 22. Bard therefore contends that Dalton has not presented evidence that would enable a reasonable jury to find that the Align device caused Dalton's injuries to a reasonable degree of medical probability.

## C

Because the court has already concluded that the opinions and testimony of Dalton's specific causation expert, Dr. Porter, are admissible, and he opines that "it is [his] opinion to a reasonable degree of medical probability that the cause of Ms. Dalton's mesh exposure and initial vaginal pain are directly related to her [Align device]," P. Resp. Exclude Mot. Ex. A at 6, the court holds that there is a genuine dispute of material fact as to causation. As already explained, Dr. Porter's inability to completely rule out all other causes does not render his causation opinion inadmissible and insufficient as a matter of law because Texas

law merely requires that the act or omission be a substantial or a producing cause—not the sole cause. And Dr. Porter's inability to directly link the Align device to the fistula is not fatal to her claims as to her mesh exposure and initial pain. Accordingly, the court denies Bard's motion for summary judgment on the basis of causation.

Bard has not challenged Dalton's negligent design claim on another other ground.[8] The court therefore denies summary judgment as to count I to the extent it encompasses a negligent design claim.

## VI

The court turns next to Bard's motion for summary judgment as to Dalton's strict liability—design defect claim.

## A

Bard seeks summary judgment on Bard's strict liability—design defect claim on the basis that Dalton "has failed to proffer any evidence that an alternative design would have been safer for [her] by preventing or significantly reducing her specific alleged injuries." D. Summ. J. Mem. at 10. Bard maintains that this is especially so because Dalton's "only case-specific expert witness, [Dr. Porter,] expressly admitted that he is not offering any testimony or opinions concerning any alternative designs or products that were available in 2010." *Id.*

Dalton opposes summary judgment on this ground, contending that the MDL court

---

[8]To the extent Bard intends to challenge Dalton's negligent design claim on the basis of failure to proffer a safer alternative design, the court addresses this argument *infra* at § VI(B).

"has found that where a Texas plaintiff presented evidence of several alternative designs, including (a) polypropylene mesh with larger pores, and (b) mesh constructed from native tissue, denial of summary judgment based on lack of an alternative design was []proper." P. Summ. J. Resp. at 10.  Moreover, she contends that the MDL court has previously held that "generally-applicable expert testimony developed by the Plaintiffs' Steering Committee and available to all claimants is sufficient to raise a fact question as to the existence of a safer alternative design." *Id.* at 10-11.  Dalton maintains that this ruling should be applied here to "ensure that the virtues of consolidation into an MDL[,] . . . particularly, the assurance of consistent pretrial rulings, are fulfilled." *Id.* at 11.

Dalton maintains that she has designated four general causation experts, each of whom "ha[s] provided opinions about general causation that are meant to be used in all cases within this MDL." *Id.* at 12.  One of these experts, Julia Elizabeth Babensee, Ph.D. ("Dr. Babensee"), opines that the defect within the Align device relates directly to inadequate pore size in the material, which inhibits tissue integration; that a safer alternative would use larger pores; and that Bard actually designed several products with those qualities at the time the Align device was marketed.  Another expert, Bruce Alan Rosenzweig, M.D. ("Dr. Rosenzweig"), opined "in a deposition applicable to all cases" that "native tissue slings are safer, feasible and had superior utility." *Id.*  Dalton posits that, even if she only presents the testimony of these two experts, the evidence is sufficient to raise a fact question, as the MDL court has already found in another case.

Bard replies that Pretrial Order 297 limits the parties to "no more than (5) five experts

per case (exclusive of treating physicians)," and therefore Dalton is limited to relying on expert testimony developed by the general causation experts in this case. D. Summ. J. Reply at 8. Bard contends that "Dr. Porter failed to develop any such opinions [related to a safer alternative design] regarding [Dalton's] design defect claims." *Id.* And even assuming that the court allows the "generally-applicable expert testimony" developed by the Plaintiffs' Steering Committee, Bard maintains that Dalton "has failed to meet her burden of coming forward with *concrete evidence* creating a genuine issue of material fact." *Id.* at 9. This is so in part because, according to Bard, Dalton "reli[es] on generally applicable expert testimony without a single citation to a particular expert's report or deposition testimony," and has therefore not presented any evidence that a safer alternative design would have prevented or significantly reduced the risk of her injuries. *Id.*

B

The court denies summary judgment on Dalton's strict liability—design defect claim because Dalton has raised a genuine dispute of material fact as to the availability of a safer alternative design. To prevail on a design defect claim, Dalton must prove that (1) the product was defectively designed so as to render it unreasonably dangerous; (2) a safer alternative design existed; and (3) the defect was a producing cause of the injury for which plaintiff seeks recovery. *Goodner*, 650 F.3d at 1040 ; *see also* Tex. Civ. Prac. & Rem. Code Ann. § 82.005(a). A safer alternative design is one that "would have prevented or significantly reduced the risk of the injury, would not substantially impair the product's utility, and was economically and technologically feasible at the time." *Norman v. Grove*

*Cranes U.S., L.L.C.*, 750 Fed. Appx. 269, 273 (5th Cir. 2018) (per curiam) (quoting *Genie Indus., Inc. v. Matak*, 462 S.W.3d 1, 7 (Tex. 2015)); *see also* § 82.005(b).

Dalton relies on the testimony of general causation experts "relate[d] to all [MDL No. 2187]," including that of Drs. Babensee and Rosenzweig.  P. Summ. J. Resp. Ex. F at 1. Despite Bard's assertion that Dalton has failed to support her contentions with evidence, Dalton cites several portions of these experts' reports as evidence of a safer alternative design.  For example, she points to portions of Dr. Babensee's expert report wherein she opines that "Bard products also lack biocompatibility because of a lack of effective pore size to support appropriate tissue integration," and that the products need to have an effective pore size of 1 millimeter, but to attain such size after implantation, the pore size would need to be "well over 1 [millimeter] for it to have this effective pore size following implantation." *Id.* at 8.  But the "average pore size of [the] Align [device] measures at 1.2 x 1mm for the large pores and 1.1 x .4 mm for the small pores," which are too small.  *Id.* at 9.  Dalton also cites the portion of Dr. Babensee's expert report in which she opines that "Bard actually designed, developed[,] and marketed products that incorporate larger pore size," including up to 3 millimeters, thereby suggesting that such a design is not only feasible but actually already in production.  *Id.* at 21.  She also points to various portions of Dr. Rosenzweig's deposition to indicate that native tissue repair is also a safer alternative design because it permits a surgeon to know much earlier whether a complication will occur.

The court concludes that, in keeping with the rulings of the MDL court for which this motion was initially briefed, this evidence creates "a genuine dispute over whether [Dalton's]

suggestions for the Align [device] amount to a safer alternative design." *Reno v. C. R. Bard, Inc.*, 2016 WL 7155771, at *4 (S.D. W. Va. Dec. 7, 2016). Because Dalton has proffered evidence that the "Align product could have been designed with larger pore sizes, . . . or could have been made, in part, with native tissue," and that "these design alternatives would have made the Align [device] a safer product," the court denies Bard's motion for summary judgment as to the design defect claim. *Id.*

## VII

The court turns next to Bard's motion for summary judgment as to Dalton's failure to warn claims.

## A

Bard invokes the learned intermediary doctrine, which provides that "[w]hen the prescribing physician is aware of the product's risks and decides to use it anyway, any inadequacy [in] the product's warning, as a matter of law, is not the producing cause of the patient's injuries." *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 774 (5th Cir. 2018) (quoting *Centocor, Inc. v. Hamilton*, 372 S.W.3d 140, 163 (Tex. 2012)). To overcome application of the doctrine, Dalton must present evidence that (1) "the doctor would have read or encountered the adequate warning; and [(2)] that the adequate warning would have altered his treatment decision for, or risk-related disclosures to, the patient." *Id.* at 775. Relevant to the latter inquiry is whether the plaintiff proffers "objective evidence . . . that a different warning would have affected the decision of a reasonable doctor." *Id.* at 774.

B

Dalton acknowledges that "the complications [she] has experienced were matters that were addressed by [her doctor] preoperatively and are noted on the consent form that Ms. Dalton signed before she underwent the procedure." P. Summ. J. Resp. at 9. She contends, however, that "there was no disclosure concerning either the severity or the frequency or duration of those potential complications," and "had [she] been apprised of the facts that the risks would be of a continuing duration . . . she would have elected against the procedure." *Id.* But Dalton fails to offer any evidence that a reasonable *physician* would have read or encountered the alleged adequate warning or that a different warning would have affected a *physician's* decision. Absent this evidence, "any inadequacy [in] the product's warning, as a matter of law, is not the producing cause of the patient's injuries." *DePuy*, 372 S.W.3d at 163. For this reason, the court grants Bard's motion for summary judgment as to both Dalton's negligence and strict-liability-based failure to warn claims. *See Fearrington v. Boston Sci. Corp.*, 410 F.Supp.3d 794, 808 (S.D. Tex. 2019) ("Plaintiff's negligence claim cannot rely on any alleged negligent failure to warn as this would be an impermissible circumvention of the learned intermediary doctrine and its bar on Plaintiff's failure-to-warn strict liability claim.").

The court turns to Bard's motion for summary judgment as to Dalton's punitive damages claim.

A

Bard contends that "[i]f the Court grants Bard's Motion[] and dismisses all of [Dalton's] underlying causes of action, [Dalton's] claim for punitive damages should be dismissed as well." D. Summ. J. Mem. at 16. Bard also contends that "punitive damages are not recoverable for any of [Dalton's] claims against Bard under Texas law" because "Texas law only permits punitive damages when a plaintiff proves by clear and convincing evidence that the harm with respect to which the plaintiff seeks recovery results from '(1) fraud; (2) malice; or (3) gross negligence.'" *Id.* at 17 (quoting Tex. Civ. Prac. & Rem. Code § 41.003(a), (b)). Bard maintains that Dalton has offered "no evidence that Bard made a conscious choice to implement a design it knew was a more dangerous alternative or that Bard otherwise acted with gross negligence," and therefore Dalton cannot raise a genuine dispute of material fact as to punitive damages. *Id.*

Dalton responds that the MDL court has previously held that plaintiffs in this MDL have developed sufficient proof to raise material fact issues regarding punitive damages. She attaches to her response the MDL court's order in *Reno*, in which the court considered the bellwether evidence adduced by various plaintiffs to be sufficient to prevent judgment as a matter of law on plaintiffs' punitive damages claim. Dalton also asserts that the MDL court has "generally detailed the evidence concerning claims for punitive damages against Bard

for its mesh products" in *In re C.R. Bard, Inc.*, 2013 WL 2432871, at *4-10 (S.D. W. Va. June 4, 2013), and that the "evidence showed that Bard knew of fundamental design flaws with its product, including the problems caused by the inadequate pore size and high density of the mesh arms[] that were 'responsible for problems experienced by patients.'" P. Summ. J. Resp. at 13. Moreover, Dalton contends that the evidence includes the "material safety data sheet for the polypropylene resin used in . . . Bard's mesh products," which states that it "'may react with oxygen and strong oxidizing agents[;]' that Bard "knew or should have known of peer-reviewed literature showing that polypropylene degrades in vivo[;]" and that "Bard chose not to conduct full biocompatibility testing on the finished products" prior to the product's release but did conduct animal testing which "failed to support the safety of the products[.]" *Id.* at 13-14. Because the MDL court concluded that "the above evidence offered by the plaintiffs creates a genuine issue of material fact as to whether Bard's actions meets each state's punitive damage standards," and because the court "expressly adopted and applied that decision in other[]" cases, Dalton "urges that th[is] [c]ourt apply that rationale[.]" *Id.* at 14.

Bard replies that summary judgment on Dalton's punitive damages claim is warranted because she "did not cite or attach any evidence, let alone clear and convincing evidence, alleging fraud, malice, or gross negligence." D. Summ. J. Reply 10. Bard maintains that there is no dispute of material fact as to this claim because there is an absence of evidence to support an award of punitive damages.

The court denies Bard's motion for summary judgment as to Dalton's claim for punitive damages. Having denied summary judgment as to some of the underlying causes of action, the court cannot grant summary judgment as to punitive damages on that ground alone. Moreover, as the court has previously explained, the briefing on these issues relies heavily on the rulings of the MDL court, and the briefs were submitted with the expectation that the MDL court would decide these issues. Although it is not clear that Dalton's citation to court orders in previous cases would typically be sufficient to create a genuine dispute of material fact as to her claims, the court deems the MDL court's previous ruling to be particularly persuasive given the context in which these motions were briefed.

As the MDL court held in *Reno*, "[t]he question of whether a plaintiff is entitled to punitive damages often involves an interlocking web of factual determinations respecting the defendant's conduct," and "[a] court thus treads cautiously, especially pretrial when adjudicating a peremptory request to remove the matter entirely from the factfinder's consideration." P. Summ. J. Resp. Ex. H at 1. The court ultimately concluded that "[t]he evidentiary record is frequently muddled enough on the point that genuine issues of material fact remain." *Id.* at 2. Such is the case here. In keeping with the MDL court's previous rulings and the bellwether evidence in this case, the court holds that "Bard is not, at least at this stage of the case, entitled to judgment as a matter of law on the punitive damages claim." *Id.*

*   *   *

For the reasons explained, the court declines to exclude the expert testimony of Dr. Porter regarding specific causation but limits his testimony to topics included in his expert report. The court grants in part and denies in part Bard's motion for summary judgment. The court grants the motion as to Dalton's failure to warn claims and denies it as to Dalton's negligent design, strict liability—design defect, and punitive damages claims.

**SO ORDERED**.

March 19, 2020.

SIDNEY A. FITZWATER
SENIOR JUDGE